# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **JUDSON S. WILSON,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:14cv00028 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Judson S. Wilson, ("Wilson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wilson filed his applications for SSI and DIB on September 27, 2010, alleging disability as of June 15, 2008, due to depression, mood disorder, anger issues, suicidal ideations and paranoia. (Record, ("R."), at 234-35, 241-44, 270, 330.) The claims were denied initially and upon reconsideration. (R. at 138-40, 143-45, 148-54, 163-65, 167-72, 174-76.) Wilson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 177.) A hearing was held on December 18, 2012, at which Wilson was represented by counsel. (R. at 28-56.)

By decision dated January 23, 2013, the ALJ denied Wilson's claims. (R. at 14-22.) The ALJ found that Wilson met the disability insured status requirements of the Act for DIB purposes through March 31, 2009. (R. at 16.) The ALJ found that Wilson had not engaged in substantial gainful activity since June 15, 2008, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Wilson had severe impairments, namely depression, a mood disorder, an anxiety disorder, post-traumatic stress disorder, ("PTSD"), a personality disorder and a history of alcohol abuse, but he found that Wilson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-18.) The ALJ found that Wilson had the residual functional capacity to perform the full range of work at all exertional levels. (R. at 19.) Due to his nonexertional limitations, the ALJ found that Wilson could perform only simple, routine, repetitive tasks in a low-stress environment that required no more than occasional decision making, changes in the work setting and interaction with co-workers and the public and that allowed him to be off task no more than 10 percent of a normal

workday. (R. at 19.) The ALJ found that Wilson could perform his past relevant work as a farm laborer and a ripsaw operator. (R. at 22.) Thus, the ALJ concluded that Wilson was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2015).

After the ALJ issued his decision, Wilson pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-6, 9.) Wilson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Wilson's motion for summary judgment filed October 28, 2014,[1] and the Commissioner's motion for summary judgment filed January 5, 2015.

## II. Facts

Wilson was born in 1971, (R. at 234, 241), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Wilson has a ninth grade education[2] and past work experience as a farm worker and a saw operator. (R. at 36, 48-49.) Wilson testified at his hearing that he no longer consumed alcoholic beverages. (R. at 35.) He stated that he could not remember the last time that he consumed an alcoholic beverage, but continued to state that "I don't drink much anymore." (R. at 35.) Wilson stated that seeing and talking to a counselor

---

[1] In his brief, Wilson requested oral argument; however, he filed a notice waiving oral argument on March 26, 2015. (Docket Item No. 21.)

[2] Although Wilson reported on his Disability Report that he completed the tenth grade, (R. at 270), he testified at his hearing that he completed the ninth grade. (R. at 36.)

helped him a lot. (R. at 35-36.) He stated that he quit his job as a farm worker because he could not get along with his supervisor and co-workers. (R. at 36-37.)

John Newman, a vocational expert, also was present and testified at Wilson's hearing. (R. at 46-54.) Newman classified Wilson's work as a farm laborer as heavy[3] and unskilled and his work as saw operator as medium[4] and semi-skilled. (R. at 49-50.) Newman was asked to consider a hypothetical individual of Wilson's age, education and work experience who had no exertional limitations, but who would be limited to simple, routine, repetitive tasks in a low-stress environment that did not require more than occasional decision making, changes in the work setting or interaction with the public or co-workers. (R. at 50.) Newman stated that such an individual could perform Wilson's past work as a saw operator and a farm worker. (R. at 50.) When asked if the same hypothetical individual who would be off task 20 percent of the workday due to anxiety and depression, and who would be expected to have 10 to 12 absences over the course of a work year, Newman stated that such an individual could perform Wilson's past work as a farm worker and a saw operator. (R. at 50-51.) Newman was asked to consider a hypothetical individual who could have no interaction with the public, who could have only occasional interaction with supervisors, who would be absent from work at least two days monthly and who would be off task 25 percent of the workday, he stated there would be no jobs that such an individual could perform, including Wilson's past work as a farm worker and a saw operator. (R. at

---

[3] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2015).

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

51.) Newman stated that there would be no jobs available that an individual could perform if he had a Global Assessment of Functioning score, ("GAF"),[5] of 45.[6] (R. at 53.) When asked to consider a hypothetical individual who had no ability to relate to co-workers, to deal with the public and to deal with work stresses, Newman stated that there would be no jobs available that such an individual could perform. (R. at 53.)

In rendering his decision, the ALJ reviewed medical records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Dr. Andrew Bockner, M.D., a state agency physician; Smyth County Community Hospital; Wellmont Bristol Regional Medical Center; Meadowview Health Clinic; Southwestern Virginia Mental Health Institute; Johnston Memorial Hospital; Highlands Community Services Board; Wade Smith, M.S., a licensed senior psychological examiner; and Holston Family Health Center. Wilson's attorney also submitted additional medical evidence from Southwest Virginia Community Health Systems, Inc., to the Appeals Council.[7]

On September 12, 2009, Wilson presented to emergency room at Johnston Memorial Hospital, ("Johnston Memorial"), with complaints of anxiety and depression resulting from relationship issues. (R. at 448-54.) Wilson reported that

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." DSM-IV at 32.

[7] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

he wanted to shoot his father. (R. at 448.) Wilson left the hospital without the medical staff knowing. (R. at 449.) After a few hours, the police[8] were able to detain Wilson, and he was returned to the hospital. (R. at 451.) Wilson was diagnosed with alcohol intoxication and homicidal ideation. (R. at 453.) Wilson was prescreened for treatment placement by Shirley Whited, M.S.W., a social worker with Highlands Community Services Board. (R. at 460-67.) Whited determined that mental illness and substance abuse were present. (R. at 460-67.) She noted that there was a substantial likelihood of serious physical harm to others, evidenced by Wilson's report that he wanted to kill his father by "blowing his head off." (R. at 462.) Whited diagnosed depression, not otherwise specified, and alcohol abuse. (R. at 462.) She assessed his then-current GAF score at 45. (R. at 462.) Wilson was not willing to be treated voluntarily. (R. at 465.) Involuntary admission and inpatient treatment was recommended. (R. at 465.) However, no psychiatric facility would accept him due to his intoxication. (R. at 452.) Wilson contracted for safety, stating that he felt much calmer and did not intend to harm anyone or himself, and was released to go home. (R. at 452.)

On June 26, 2010, Wilson presented to the emergency room at Johnston Memorial for complaints of depression and suicide ideation. (R. at 473-75.) Wilson reported that he had a plan to either hang himself or to shoot himself. (R. at 473.) He stated that he had not experienced similar symptoms in the past. (R. at 473.) He was transferred to Ridgeview Pavilion.[9] (R. at 474.)

---

[8] An Emergency Custody Order was issued for Wilson for his return to Johnston Memorial for completion of the evaluation. (R. at 457.)

[9] The record does not contain the medical records from Ridgeview Pavilion.

On June 27, 2010, Wilson was admitted to Wellmont Bristol Regional Medical Center for depression and suicidal ideations. (R. at 373-410.) Wilson reported that his most recent stressor was dealing with his biological father having a relationship with his ex-girlfriend, the mother of his child. (R. at 373.) Wilson denied any active medical problems. (R. at 373.) He denied drug or alcohol problems, although when he was tested, his blood alcohol level was 0.187. (R. at 375.) His GAF score upon admission was assessed at $20^{10}$ to $30.^{11}$ (R. at 376.) Wilson was given medication, and his psychiatric symptoms resolved by discharge on July 1, 2010. (R. at 373.) Wilson was diagnosed with major depressive disorder. (R. at 373.) His GAF score upon discharge was assessed at 50 to $55.^{12}$ (R. at 373.)

On August 6, 2010, Wilson presented to the emergency room at Johnston Memorial after becoming despondent as a result of alcoholic consumption. (R. at 475-86.) Wilson stated that he wanted to harm his ex-girlfriend, his father and himself. (R. at 477.) A temporary detention order was obtained. (R. at 477.) Wilson was found to be intoxicated with a blood alcohol level of 0.441. (R. at 477, 483.) His liver function tests also were elevated. (R. at 477.) Wilson reported consuming five to eight beers on a daily basis. (R. at 477.) He was admitted and diagnosed with alcohol intoxication, suicidal and homicidal ideation and elevated liver function. (R. at 478.)

---

[10] A GAF score of 11 to 20 indicates that the individual has "[s]ome danger of hurting self or others ... OR occasionally fails to maintain minimal personal hygiene ... OR gross impairment in communication ...." DSM-IV at 32.

[11] A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

[12] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

On August 7, 2010, Wilson was admitted to the Southwestern Virginia Mental Health Institute, ("SVMHI"), on a temporary detention order. (R. at 430-31, 487-94.) It was noted that Wilson had contacted SVMHI three years prior and made suicidal and homicidal statements regarding both his father and ex-girlfriend. (R. at 430.) Wilson reported that he made these threats after having too much to drink. (R. at 430.) Wilson was placed on an alcohol withdrawal regimen. (R. at 430.) Upon discharge on August 9, 2010, Wilson's mood was euthymic, and he had an appropriate affect. (R. at 431.) His memory was intact for both recent and remote events. (R. at 431.) Wilson's insight was limited, and his judgment was deemed as fair. (R. at 431.) He was diagnosed with alcohol intoxication, resolved; alcohol dependence; nicotine dependence; and mood disorder, secondary to alcohol intoxication. (R. at 430-31.) Wilson's then-current GAF score was assessed at 55. (R. at 431.)

On February 3, 2011, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Wilson suffered from an affective disorder and an alcohol substance addiction disorder. (R. at 99.) He opined that there was insufficient evidence to determine what effect Wilson's impairments had on his performance of activities of daily living, on his ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 99.) Leizer noted that Wilson was scheduled for a consultative examination and failed to keep the appointment. (R. at 99.) Leizer opined that the evidence did not show that Wilson's condition was disabling. (R. at 101.)

On June 14, 2011, Carol Wilson, F.N.P., a family nurse practitioner with Meadowview Health Clinic, saw Wilson for hypertension, abdominal pain and anxiety. (R. at 503-04, 557-58.) Wilson reported that he did not consume alcoholic beverages; however, Nurse Wilson reported that he smelled of alcohol. (R. at 503,

557.) Nurse Wilson reported that Wilson made poor eye contact, had a flat affect and had no suicidal or homicidal ideations. (R. at 503, 557.) Wilson was diagnosed with anxiety disorder, not otherwise specified, and behavioral health counseling was recommended. (R. at 504, 558.) On June 28, 2011, Donna E. Boggs, L.C.S.W., a licensed clinical social worker with Meadowview Health Clinic, saw Wilson for a behavioral health counseling evaluation. (R. at 505, 559.) Wilson reported having a difficult time dealing with his father starting a relationship with his ex-girlfriend, the mother of his child. (R. at 505, 559.) He stated that he had been so depressed that he had contemplated harming himself. (R. at 505, 559.) He reported having nightmares and obsessively thinking about the situation, admitting that he could not "move past it." (R. at 505, 559.) Boggs diagnosed PTSD. (R. at 505, 559.)

On July 5, 2011, Wilson stated that he had overcome some of the emotional pain in regard to his father and ex-girlfriend, but was feeling angry. (R. at 506, 560.) Boggs noted that Wilson was careful to say that he had no plans to harm anyone. (R. at 506, 560.) Boggs reported smelling alcohol on Wilson, and she planned to address alcohol abuse at the next scheduled session. (R. at 506, 560.) On July 12, 2011, Wilson was very agitated and angry. (R. at 507, 561.) He stated that his ex-girlfriend stayed all week with his father, who lived next door to him. (R. at 507, 561.) Boggs reported the smell of alcohol on Wilson, but he did not appear to be intoxicated. (R. at 507, 561.) Boggs suspected that Wilson was drinking to self-medicate. (R. at 507, 561.) Wilson stated that he consumed only a couple of beers occasionally. (R. at 507, 561.) On July 27, 2011, Wilson had an improved affect and mood. (R. at 508, 562.) Wilson reported that he was beginning to manage the strong emotions around his issues with his father and ex-girlfriend. (R. at 508, 562.) On July 29, 2011, Nurse Wilson saw Wilson for complaints of depression and sleep disturbance. (R. at 509-11, 563-65.) Wilson stated that he

consumed beer only when his father bought it and that he would consume only four to five beers. (R. at 509, 563.) Nurse Wilson diagnosed depression with anxiety and alcohol abuse. (R. at 509-10, 563-64.)

On August 30, 2011, Boggs reported that Wilson presented with a "fairly calm demeanor." (R. at 567.) Wilson reported that he no longer ruminated on the issue of his father. (R. at 567.) He reported that he did not like a lot of social interaction and that he was easily angered and agitated. (R. at 567.) On September 14, 2011, Wilson reported that he felt "fairly stable." (R. at 568.) He stated that he was not as depressed. (R. at 568.) Boggs diagnosed major depression, not otherwise specified. (R. at 568.) On September 21, 2011, Wilson reported that he continued to be depressed, but that he was managing his symptoms better. (R. at 569.) He stated that he preferred to be alone and was socially isolative. (R. at 569.) Boggs noted that Wilson had some prominent schizoid features. (R. at 569.) She reported that she had not noticed any obvious sign of alcohol abuse. (R. at 569.) On September 30, 2011, Boggs completed a Patient Injury And Work Status (Medical Opinion) form, indicating that Wilson was unable to work due to his diagnoses of recurrent major depression with schizoid features and suicidal/homicidal ideations. (R. at 521.)

On January 25, 2012, Boggs noted that Wilson seemed to be in a "somewhat better place" with the issues regarding his father and ex-girlfriend. (R. at 544.) On March 6, 2012, Boggs reported that Wilson was "fairly stable." (R. at 539.) Wilson reported becoming more depressed and agitated when he did not attend treatment. (R. at 539.) On March 10, 2012, Wilson reported an increase in depression and anxiety. (R. at 534.) He reported alcohol use. (R. at 534.) Nurse Wilson reported that Wilson had poor eye contact and poor concentration. (R. at 535.) She diagnosed major depression, not otherwise specified, and alcohol abuse, not

otherwise specified. (R. at 535.) On March 13, 2012, Wilson reported that he continued to have transient thoughts of self-harm and at times wanted to harm his father and ex-girlfriend. (R. at 537.) He stated that he was using the skills that he learned to move beyond these thoughts. (R. at 537.) On May 25, 2012, Wilson reported that he felt shaky every day. (R. at 530.) He stated that he worked puzzles when he became stressed. (R. at 530.) On July 18, 2012, Wilson reported deterioration in his progress since his last visit. (R. at 633-34.) Melissa Doane-Williams, L.C.S.W., a licensed clinical social worker with Meadowview Health Clinic, reported that Wilson had slow, withdrawn behavior, minimal insight, depressed mood, flat and angry affect, slowed speech and thoughts of helplessness and worthlessness. (R. at 633.) Doane-Williams diagnosed dysthymia. (R. at 633.) She assessed Wilson's then-current GAF score at 50. (R. at 633.)

On August 15, 2012, Wilson reported feeling more paranoid, stating that he would hide in bushes when a car passed by. (R. at 631-32.) Nurse Wilson diagnosed dysthymia. (R. at 632.) On August 22, 2012, Doane-Williams reported that Wilson had appropriate behavior, improved insight, flat affect, slowed speech and thoughts of helplessness and worthlessness. (R. at 629-30.) She completed a Patient Injury And Work Status (Medical Opinion) form, indicating that Wilson was unable to work due to his diagnosis of dysthymia. (R. at 611.) On August 31, 2012, Doane-Williams reported that Wilson had appropriate behavior, appropriate insight, depressed mood, flat affect, slowed speech and coherent thought processes. (R. at 627-28.) On September 14, 2012, Wilson stated that his mood seemed to "roller coaster." (R. at 624-25.) He stated that he was feeling better, but knew that, later, his mood would start to feel down. (R. at 624.) Nurse Wilson diagnosed depression with anxiety and alcohol abuse, not otherwise specified. (R. at 624.) On September 28, 2012, Doane-Williams reported that Wilson had appropriate behavior, appropriate insight, cheerful mood, bright affect, normal speech and

coherent thought processes. (R. at 622-23.) Doane-Williams diagnosed dysthymia. (R. at 622.) She assessed Wilson's then-current GAF score at 50. (R. at 622.)

On October 24, 2012, Doane-Williams completed a mental assessment indicating that Wilson had an unlimited ability to maintain personal appearance. (R. at 613-14.) She opined that Wilson had a seriously limited, but not precluded, ability to follow work rules; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out simple instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 613-14.) Doane-Williams opined that Wilson had no useful ability to relate to co-workers; to deal with the public; to deal with work stresses; and to understand, remember and carry out complex and detailed instructions. (R. at 613-14.)

On October 26, 2012, Wilson reported deterioration in his progress since his last visit. (R. at 617.) Doane-Williams reported that Wilson had appropriate behavior, limited insight, depressed mood, flat affect, normal speech and coherent thought processes. (R. at 617.) On November 14, 2012, Doane-Williams reported that Wilson had lost 10 pounds and appeared to be underweight. (R. at 615.) Wilson had appropriate behavior, limited insight, depressed mood, flat affect, normal speech and coherent thought processes. (R. at 615.) On December 27, 2012, Wilson reported having a difficult time getting through the holiday season due to the situation with his father and ex-girlfriend. (R. at 666.) Doane-Williams reported that Wilson had a depressed mood and angry affect. (R. at 666.) She assessed his then-current GAF score at 50. (R. at 666.) On January 10, 2013, Wilson was counseled to assist him with anger management and depression. (R. at 659.) Wilson reported an increase in depressive symptoms since the holidays. (R. at 664.) He reported increased thoughts of suicide. (R. at 664.) On January 22,

-12-

2013, Nurse Wilson reported that Wilson had poor eye contact, flat affect and poor concentration. (R. at 661-63.) On January 30, 2013, Wilson was counseled to assist him with his relationship issues. (R. at 664.) Wilson had a bright affect and cheerful mood. (R. at 659.) Doane-Williams assessed Wilson's then-current GAF score at 55. (R. at 659.)

On September 15, 2011, Wade Smith, M.S., a licensed senior psychological examiner, evaluated Wilson at the request of Disability Determination Services. (R. at 515-19.) Wilson reported being charged with driving under the influence on three occasions. (R. at 515.) Smith noted a fine tremor in Wilson's hand when he extended his arm. (R. at 516.) Wilson had intact attention, concentration, short-term memory and recent and remote memory. (R. at 517.) Smith reported that Wilson's interpersonal skills were limited by anxiety and personality traits. (R. at 518.) Smith found that Wilson was able to comprehend and follow both simple and some detailed job instructions. (R. at 518.) Wilson's concentration and persistence appeared adequate to meet the demands of simple or detailed work-related decisions. (R. at 518.) Wilson had a moderately to markedly impaired ability to interact with others in an appropriate manner and to tolerate normal job stress. (R. at 518.) Wilson had no limitations in his ability to adapt to changes in the workplace, to be aware of normal hazards or to take appropriate precaution. (R. at 518.) Smith diagnosed anxiety disorder, not otherwise specified; depressive disorder, not otherwise specified; rule out alcohol abuse; and personality disorder, not otherwise specified. (R. at 519.) He assessed Wilson's then-current GAF score at 45. (R. at 519.)

On October 3, 2011, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF, indicating that Wilson suffered from an affective disorder, an anxiety-related disorder and a personality disorder. (R. at 122.) Dr. Bockner opined

-13-

that Wilson had mild difficulties in his ability to perform activities of daily living and in maintaining concentration, persistence or pace. (R. at 122.) He found that Wilson had moderate difficulties in maintaining social functioning and had experienced no repeated episodes of decompensation of extended duration. (R. at 122.)

Dr. Bockner completed a mental assessment, indicating that Wilson had no significant limitations in his ability to remember locations and work-like procedures; to understand, remember and carry out very short, simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 124-25.) He found that Wilson had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 124-25.)

On October 4, 2011, Dr. Michael Hartman, M.D., a state agency physician, determined that there was insufficient evidence to support a decision on Wilson's claim. (R. at 113-14.)

On February 24, 2012, Wilson was seen at Holston Family Health Center for anxiety and depression. (R. at 528.) Pat Baston, L.C.S.W., a licensed clinical social worker, noted that Wilson was obviously very angry. (R. at 528.) Wilson reported having suicidal thoughts, but denied intent. (R. at 528.) Baston reported that Wilson was "slightly paranoid" when in a group setting. (R. at 528.) She diagnosed major depressive disorder, recurrent, moderate; and panic disorder, with agoraphobia. (R. at 528.) On March 2, 2012, Wilson was seen for anxiety and depression. (R. at 527.) Wilson reported that his ex-girlfriend was not allowing him to have visitation with his daughter. (R. at 527.) It was reported that Wilson was anxious. (R. at 527.) Wilson was diagnosed with major depressive disorder, recurrent, moderate; and panic disorder with agoraphobia. (R. at 527.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

-15-

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Wilson argues that substantial evidence does not exist to support the ALJ's finding that he could perform his past relevant work. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-11.) Wilson argues that the ALJ erred by ignoring the restrictions placed upon him by psychologist Smith. (Plaintiff's Brief at 8-9.) Wilson does not contest the ALJ's findings with regard to his physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wilson argues that the ALJ erred by failing to give full consideration to the restrictions placed upon him by psychologist Smith when determining the severity of his mental impairments and the resulting effects on his work-related abilities.

(Plaintiff's Brief at 8-9.) Wilson notes that Smith assigned a GAF score of 45, denoting serious symptoms. (Plaintiff's Brief at 9.) Wilson also asserts that Smith found him to be credible because he stated that Wilson was not exaggerating his symptoms in order to obtain disability benefits. (Plaintiff' Brief at 9.) Based on my review of the record, I do not find Wilson's arguments persuasive.

The ALJ considered Smith's assessment and acknowledged the GAF score of 45. (R. at 21.) The ALJ concluded that Smith's commentary about Wilson's ability to work indicated that Wilson could do simple work with limited interaction with others and limited job stress. (R. at 21, 518.) Smith reported that Wilson presented with a normal level of energy and that his fine and gross motor skills appeared to be within normal limits. (R. at 518.) Smith found that Wilson was able to comprehend and follow both simple and some detailed job instructions. (R. at 518.) Wilson's concentration and persistence appeared adequate to meet the demands of simple or detailed work-related decisions. (R. at 518.) Wilson reported that he needed no special reminders to take care of his personal needs and grooming or to take his medication. (R. at 287-88.) He also reported that he finished what he started. (R. at 291.) The record shows that Wilson had an intact memory for both recent and remote events. (R. at 431, 517.) Smith described Wilson's ability for attention and concentration as intact. (R. at 517.) Smith reported that Wilson had no limitations in his ability to adapt to changes in the workplace, to be aware of normal hazards or to take appropriate precaution. (R. at 518.) While Smith opined that Wilson showed a moderately to markedly impaired ability to interact with others in an appropriate manner and to tolerate normal job stress, the ALJ accommodated these limitations by limiting Wilson to no more than occasional interaction with the public or co-workers in a low-stress environment. (R. at 19, 518.) *See Washington v. Soc. Sec. Admin., Comm'r*, 503 Fed. App'x 881, 883 (11th Cir. 2013) (finding that a limitation to "occasional interaction with the

-17-

Case 1:14-cv-00028-PMS   Document 22   Filed 09/21/15   Page 17 of 19   Pageid#: 766

general public and co-workers" adequately accommodated a claimant's moderate limitation in social functioning).

While Smith assessed Wilson's GAF score at 45, (R. at 519), the record includes significantly higher GAF scores ranging between 50 and 55, denoting moderate symptoms, after treatment for depression and cessation of alcohol. (R. at 373-74, 431, 615, 617, 622, 627, 629, 633, 638, 640, 642, 647, 651, 653, 655, 657, 659, 664, 666.) Smith reported that Wilson was not seen as exaggerating his symptoms, but noted the inconsistency between Wilson's statement that he did not abuse alcohol and the results of his June 2010 blood alcohol testing. (R. at 375, 516-17.) In addition, the record shows that Wilson's symptoms of anxiety, depression and anger were worse when he consumed alcohol. (R. at 503, 506, 507, 509-10, 534-35.) In March 2012, Nurse Wilson noted that Wilson had resumed alcohol consumption and she instructed him to stop alcohol consumption due to its depressant effects. (R. at 535.)

The ALJ noted that he was assigning some weight to the opinions of Boggs and Doane-Williams, although neither of them are acceptable medical sources. (R. at 21.) *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d) (2015). The ALJ noted that their opinions were not fully consistent with the evidence of record, including their own progress notes. (R. at 21.) Doane-Williams assessed Wilson with dysthymia, a mild chronic depression. (R. at 640.) On July 13, 2012, Wilson presented with a brighter affect and mood. (R. at 638.) He reported that he was better and less depressed. (R. at 638.) He stated that counseling helped him "a lot." (R. at 35-36.) In addition, the record shows that with medication and the abstinence of alcohol, Wilson's psychiatric symptoms resolved. (R. at 373, 508, 539, 562, 568, 569, 622.) "If a symptom can be reasonably controlled by medication or

-18-

Case 1:14-cv-00028-PMS   Document 22   Filed 09/21/15   Page 18 of 19   Pageid#: 767

treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Based on the above reasoning, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence in determining Wilson's mental residual functional capacity. I also conclude that substantial evidence supports the ALJ's finding that Wilson could perform his past relevant work as a farm laborer and a saw operator. An appropriate order and judgment will be entered.

DATED: September 21, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE